

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

DANA A. MCCRAY,                     §
                                    §
          Petitioner,               §
                                    §
v.                                  §     No. 4:12-CV-576-A
                                    §     (Consolidated with
RICK THALER, Director,              §     4:12-CV-578-A)
Texas Department of Criminal        §
Justice, Correctional               §
Institutions Division,              §
                                    §
          Respondent.               §

<u>MEMORANDUM OPINION</u>
<u>and</u>
<u>ORDER</u>

This is a petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254 filed by petitioner, Dana A. McCray, a state

prisoner currently incarcerated in Livingston, Texas, against

Rick Thaler, Director of the Texas Department of Criminal

Justice, Correctional Institutions Division, respondent.  After

having considered the pleadings, state court records, and relief

sought by petitioner, the court has concluded that the petition

should be denied.

A.   FACTUAL AND PROCEDURAL HISTORY

In 2006 petitioner was charged by separate indictments with

(a) aggravated assault of a public servant, C. Mills, a Fort

Worth police officer, with a deadly weapon, and (b) aggravated

assault of Carlos Toledo with a deadly weapon.   Each indictment included a repeat-offender notice alleging a prior felony conviction.   The cases were docketed in the Criminal District Court Number Four of Tarrant County, Texas, as Case Nos. 1026153D and 1026171D.   (01SHR at 179; 02SHR at 177.[1])   They were consolidated for trial and tried to the same jury.   On October 11, 2007, the jury found petitioner guilty of both offenses. Petitioner pleaded true to the repeat-offender allegations.   The jury sentenced petitioner to thirty-five years' confinement in Case No. 1026153D and twenty years' confinement in Case No. 1026171D, the sentences to run concurrently.   (01SHR at 181; 02SHR at 178)

Petitioner appealed his convictions, but the Second District Court of Appeals of Texas affirmed the trial court's judgments, and the Texas Court of Criminal Appeals refused his petitions for discretionary review.   *McCray v. State*, Nos. 02-07-393-CR, 02-07-394-CR, 2009 WL 806892 (Tex. App.–Fort Worth Mar. 26, 2009); *McCray v. State*, PDR Nos. 652-09 & 653-09.   Petitioner also filed two state habeas applications, one for each conviction, relevant to this federal petition, which were denied by the Texas Court of

---

[1]"01SHR" refers to the state court record in petitioner's state habeas application no. WR-77,962-01; "02SHR" refers to the state court record in petitioner's state habeas application no. WR-77,962-02.

Criminal Appeals without written order on the findings of the trial court.  (01SHR at cover, 2; 02SHR at cover, 2)

The state appellate court summarized the testimony at trial as follows:

**Carlos Toledo**

Toledo, the victim of the aggravated assault with a deadly weapon, testified that after work on June 15, 2006, he went to a convenience store on Lancaster and Beach Streets in Fort Worth around 7:00 or 8:00 p.m. His friend Isidro Salazar was driving the truck the two were riding in; Salazar parked the truck close to the store's entrance.  Toledo went inside to make some purchases.  After he came back out, he went to get back into the passenger side of the truck.  As he was trying to get in, a man was backing out a car in the next space and almost hit the back of the truck.  Toledo told the man to be careful, and the man "approached [him], and he cussed [him] and then stabbed" him with a knife.

The man tried to stab Toledo again, but "some police officers came and stopped him."  Toledo said they identified themselves as police officers and told everyone to put their hands in the air.  Toledo jumped on the sidewalk back toward the store.  He saw the police officers holding the man, but he did not see appellant stab anyone else, nor did he see the shooting very clearly because he was feeling dizzy and almost fell.  After he heard the shots, he saw the man, who fell and ended up on the ground.  According to Toledo, "it was so quick."

On cross-examination, Toledo testified that when the man approached him, Salazar got out of the truck and came over "to go close to" him.  He did not recall Salazar having a sledgehammer.  However, a photograph was admitted into evidence, which Toledo identified as being the back of Salazar's truck, showing a sledgehammer in the back.

## Chad Mills

Chad Mills, a former officer with the Fort Worth
Police Department, testified that on June 15, 2006, he
and his then-partner Officer Garrett Hull were working
undercover investigating narcotics complaints.  That
night, Mills was wearing a blue short-sleeve T-shirt, a
pair of blue jeans, and a pair of "all-purpose-type
shoes"; he and Officer Hull would normally wear "[s]ome
sort of plain T-shirt and a pair of jeans . . . and
tennis shoes" when working undercover so that they
would not be recognized.  But Mills also wore a badge
on a neck chain under his T-shirt.

That night, Mills and Officer Hull stopped at the
store on a break to get something to drink.  After
buying a drink, Mills went outside and waited by the
car for Officer Hull to come outside.  While he was
waiting, he saw "some sort of confrontation" between
the passenger of a pickup truck and the driver of a
car, whom he identified as appellant; he could hear the
men arguing.  As Mills was watching, appellant got out
of the car "in an aggressive manner" and approached the
truck; at the same time, the passenger, whom Mills
identified as Toledo, got out of the truck so that the
two were face to face.  Mills then walked around the
front of the truck and started to approach appellant
and Toledo, intending to stop the fight.  As he walked
toward them, Mills pulled out his badge and identified
himself as a Fort Worth police officer.  He held the
badge up by his face and told them to stop what they
were doing.  Appellant was facing Mills, and Toledo had
his back toward Mills.

Mills saw appellant push Toledo; as he got closer
and the two men separated, Mills realized that Toledo
was holding his stomach.  He did not realize that
Toledo had been injured, though.  Appellant then came
toward Mills with "his right hand in the air as if he
were going to throw a[n] overhand-type punch" toward
Mills.  Mills took a step back and pushed appellant
away while stepping aside trying to avoid appellant.
But appellant reached over the top of Mills's left

4

shoulder and stabbed him with a knife.  Mills tried to
step back farther, but appellant lunged toward him
again.  Appellant did not stab Mills a second time,
however, because Officer Hull, who was standing behind
Mills, shot appellant twice.

Mills testified that appellant fell to the ground
after Officer Hull shot him, and the knife fell out of
his hand.  But appellant quickly got back up, grabbed
the knife off the ground, and ran to the front doors of
the store.  Mills did not realize he had been stabbed;
he and Officer Hull detained appellant before he could
go inside the store.  They then sought medical
attention for Toledo, whom Mills realized had been
injured.  Mills did not know that appellant had stabbed
him too until Officer Hull told him.

On cross-examination, Mills admitted that he did
not see Salazar get out of the truck; he was focused on
what was happening between appellant and Toledo.  Mills
testified that "immediately when [he] was identifying
[himself] as a police officer is when [appellant]
lunged towards [him] with his right hand and stabbed
[him] in [the] shoulder."  He clarified that when he
pulled the badge out from under his shirt and displayed
it, he also said loudly, "police officer, Fort Worth
police officer."  According to Mills, the entire
encounter lasted only seconds.

When Officer Hull shot appellant, Mills heard the
shots coming from his left side.  Mills testified that
Officer Hull, who was dressed similarly to Mills, had
identified himself as a Fort Worth police officer as
well.  Mills corroborated still photographs from the
surveillance camera at the store, which indicated that
the entire incident took less than one minute.

**Officer Bill Yeager**

Fort Worth Police crime scene officer Bill Yeager
examined the scene after the stabbings and shooting.
The State offered fourteen photographs of the scene

taken by Officer Yeager as well as a diagram that he
had prepared showing the location of the items he
found.

Officer Yeager first found a fired casing under
appellant's car.  He found a second fired casing on the
ground in front of appellant's car, but he never did
find any bullets.  Officer Yeager also photographed the
blood trail from appellant; he said it was not a
continual stream but spots or drops without a
"discernable directionality."  On the diagram, Officer
Yeager drew the line of the blood trail around the back
of Salazar's truck and the vehicle Mills and Officer
Hull were driving up to the front of the store.
Officer Yeager noted that there were blood stains on
the glass around the store's front door, the door
itself, and the door handles.

On the sidewalk in front of the store, in between
Salazar's truck and the officers' vehicle, Officer
Yeager found a bloodstained white shirt.  Also on the
sidewalk, closer to the front door of the store,
Officer Yeager found a ball cap.  He found a cell phone
in the parking lot just outside the store's front
doors, near the path of the blood trail.  Immediately
in front of the store's front doors, Officer Yeager
found a knife and a cap for the knife; a blood-stained,
torn orange shirt; two earrings; a blood-stained white
tank top; a blood-stained receipt; and a blood-stained
condom in a wrapper.

Officer Yeager testified that from the location of
the casings, he could tell that the bullets were shot
from the area in front of appellant's and Salazar's
vehicles.  He also testified that, in his opinion, the
knife was a deadly weapon, capable of causing serious
bodily injury or death.

On cross-examination, Officer Yeager admitted that
the photographs he took at the scene did not show the
blood trail that he drew on the diagram.  He also
admitted that it was "a possibility" that if someone

6

had been shot at the door, it could create a spatter
such as the one he observed on the door of the store.
When asked if the blood spatter at the door was
inconsistent with someone being injured by the
vehicles, Officer Yeager stated,

> No.  If somebody was injured, they could
> cause that blood spatter to be on the doors,
> and there also could be a blood trail-whether
> it be two drops or 100 drops, there could
> actually be a blood trail on the parking lot.
> However, it was not-the blood trail was not
> photographed or projected in a photograph
> from my testimony.

On redirect, Officer Yeager testified that the
blood on the door handle was a smear, which indicates
"someone already having blood on their hands and then
smearing it down the handle or the blood was already
there and then they-they smeared the blood that was
already there."  According to Officer Yeager, the blood
on the door was possibly consistent with someone
bleeding from the chest with blood on his hands or
someone transferring the blood to the door from bloody
clothing or an injury.  But Officer Yeager also
admitted that if blood had been on the door, the
officers could have smeared it when they walked in
after the shooting.  He also said that the blood trail
he noted on the diagram that was around the vehicles
did not show up on the photographs because of a
malfunction of his camera's flash.

Officer Yeager admitted that he did not know who
the earrings, receipt, or wrapped condom belonged to.
He simply photographed them because he found them at
the scene.  But someone told him that the cell phone he
found belonged to appellant.  There was blood spatter
on the inside of the cell phone, which was lying in the
open position.

**Officer Garrett Hull**

Officer Hull testified that on the night in question, he was exiting the store and going to the driver's side of the car when Mills got his attention. Mills told Officer Hull that he thought something was going on in the parking lot.  Officer Hull then saw the car and truck parked next to them; he said it "looked like there was some sort of confrontation going on between the two parties."  But he could not hear what the men were saying.

According to Officer Hull, he and Mills displayed their badges and had already begun verbally identifying themselves as police officers as they were walking around to where appellant and Toledo were standing. Officer Hull was standing behind Mills as Mills got between appellant and Toledo; it was then that Officer Hull saw appellant stab Mills.  Officer Hull described the stabbing and following events:

> I . . . saw that he had made a punching-type motion to Mr. Toledo, but I didn't realize at that time that he had a knife in his hand. It wasn't until I saw the defendant's hand above his head with the knife and come down on Chad is when I observed, oh, he's got a knife in his hand, and I realized that he had stabbed Mr. Toledo as well.

> . . .

> [T]he whole time, approaching the situation, I was constantly identifying ourselves as police officers trying to get it to stop. And, at that time, I realized that the threat was imminent, and he-Chad-when Chad got stabbed, he kind of pushed away from the defendant, and the defendant was still in a real close proximity to us and Mr. Toledo, and he still had the knife raised in an aggressive manner, so it was an imminent threat.  And, at that time, I drew my service

8

weapon and fired.

Officer Hull said that he used deadly force against
appellant because he thought he, Mills, and Toledo were
all at risk of serious bodily injury or death because
of appellant's actions.  Officer Hull saw the driver of
the truck, Salazar, inside the truck during the
argument and also saw him get out of the truck after
the stabbing to check on Toledo; however, he never saw
Salazar with a sledgehammer.

**John Salazar**

John Salazar, a witness who was pumping gas during
the incident, testified that he saw "a skirmish, a
fight" in front of the store.  As he described it, the
events "started out with a verbal argument, and then .
. . rose to a kind of shoving match to a fight."
According to Salazar, the two men just started out
talking to each other, then got in each other's faces,
shouting and then shoving.  It was too far away for him
to hear what the men were saying, but he heard
shouting.  When the first officer approached the men,
Salazar could tell that he was telling them something,
but he was too far away to hear exactly what.  He could
not hear whether Mills identified himself as a police
officer.

Salazar testified that when Mills arrived at the
two men, he started to "break up the fight."  He then
took aside appellant and was talking to him, "and they
started putting hands on each other and then, . . .
they were fighting."  According to Salazar, appellant
and Mills "kind of wrestled around a couple of
seconds."  Officer Hull then came out of the store, and
Salazar heard someone shout, "[H]e's got a knife";
Salazar heard Officer Hull say freeze and saw him fire
two shots a couple of seconds later.  Salazar was
certain Officer Hull said "freeze" but could only say
that he *thought* Officer Hull also said "freeze,
police."

Salazar said that appellant "ran kind of like in a

9

half circle back towards the store door" after he had
been shot.  In other words, he initially ran toward the
rear of the vehicles but then turned back to go toward
the store doors, which is where he collapsed.  Salazar
testified that the route he saw appellant take was
consistent with the blood trail outlined by Officer
Yeager.  Salazar could not recall what direction
appellant was facing when Officer Hull shot him.  He
did not see a knife in appellant's hands, but he was
about twenty-five to thirty feet away from what was
happening.

**Charles Hollie**

    Charles Hollie testified that he had gone to the
store to buy a drink.  As he was waiting in line, he
heard "a little bang, like a shot."  He looked around
and saw a man running toward the store; he then heard
someone say "police, freeze," followed by another
gunshot.  He saw Officer Hull shoot appellant in the
arm.  The State questioned Hollie about the statement
Hollie gave to the police about an hour after the
shooting in which he stated that he heard "police"
before the first shot.  When confronted with his
statement, Hollie initially maintained that he heard
Officer Hull say "police" after the first shot.  But
when asked if he was not telling the truth in the
statement, Hollie said, "I really don't remember ma'am.
I'm just-I really don't remember."

**Victoria Van Fleet**

    Victoria Van Fleet, a forensic firearms examiner
with the Fort Worth Police Department, examined the T-
shirt appellant had been wearing when he was shot to
determine whether holes in it were "bullet defects" and
to see if she could "notice any gun powder or some kind
of residue on it to determine . . . a muzzle-to-target
distance."  She found a hole in the left arm that
appeared to be caused by the passage of a bullet; the
hole was a little smaller in the front than in the
back, possibly indicating that the direction of the
shot was from the front to the back.  She also examined

a white tank top that appellant had been wearing; it had a hole that was "quite a bit larger" in the back than in the front.  She testified that this was consistent with a hollow point bullet passing from the front to the back of the shirt because those bullets expand upon striking something.  However, Van Fleet also testified that she could not be sure the holes she saw in the shirts were bullet holes; the chemical tests she ran for gunpowder and lead came back negative.  She conceded on cross-examination that it is possible that holes in the back of a shirt could become bigger from a person's lying on the ground and being moved around.

When asked by appellant's counsel whether a surgeon could tell which way a bullet entered a person's body by the direction it was facing when the surgeon removed it, Van Fleet explained that a bullet can rotate inside a person after entry, "[s]o just because the direction is pointing one way does not mean that's the way it was fired."  Also on cross-examination, the defense offered, and the trial court admitted, appellant's medical records, in which the doctor treating his gunshot wound stated numerous times that one of the wounds was to appellant's back, exiting his left nipple.  But Van Fleet also testified, both on direct and cross, that the report said elsewhere that the *entrance* wound was under the nipple.  In addition, the discharge report showed that appellant had been treated for a "GSW left chest."

**Detective Troy Lawrence**

The State called Troy Lawrence, a Fort Worth police detective.  He testified that he interviewed three adults and one child who had witnessed some of the events at the store.  He also retrieved the store's video surveillance system on a CD.  The State offered still photos from the surveillance system.  However, none of those photos show clearly what happened outside the store, only what was going on inside.

The State played a recording of Detective Lawrence's interview with Hollie.  When asked what he

saw and heard that night, Hollie told Detective
Lawrence that he heard a shot, "police, police," and a
second shot.  When Detective Lawrence asked Hollie to
clarify when he heard "police, police," Hollie
initially said "after," but then quickly corrected
himself and said that he heard it before the first
shot.  According to Hollie, he heard the first shot,
saw appellant running, heard the second shot, and
finally heard appellant say, "Allright, allright" and
fall down in front of the door.  But he also said that
he hid after the second shot.

On cross-examination, Detective Lawrence testified
that when reviewing the surveillance tape, he could
hear the gunshots but not any talking outside the
store; however, he also said that just because the
recorder did not pick up the sound of voices outside
the store did not mean that a person inside the store
could not have heard them.

Appellant's Witnesses

Appellant called three witnesses, two of whom
testified that before the incident, appellant had been
at their house to watch television and had left
sometime after 8:00 p.m. to go to the store.  Marsha
Adams, a Fort Worth police administrative assistant in
the internal affairs division, testified that no
internal affairs investigation file for Officer Hull existed.

(01SHR at 187-200; 02SHR at 184-97) (footnotes omitted)

## B.  ISSUES

In this petition, petitioner raises the following grounds

for habeas relief:

(1)  He was denied due process of law, equal protection
     under the law and a fair trial by the trial court
     at his bond hearing;

(2)  The state prosecutor, Rainy Webb, should have

12

recused herself due to her becoming a material
witness to the defense;

(3)   The trial court abused its discretion and denied
      him due process and a fair trial during voir dire;

(4)   He was denied effective assistance of trial
      counsel;

(5)   He was denied effective assistance of appellate
      counsel;

(6)   He was denied due process and equal protection by the
      trial court denying him a public trial by closing voir
      dire proceedings;

(7)   The evidence was insufficient to support his
      convictions;

(8)   The trial court erred by not granting a *Batson*
      challenge to a juror excused by the court; and

(9)   The trial court erred by not granting an instruction
      relating to self-defense against multiple attackers in
      violation of due process of law.[2]

(Pet. at 6-8K)

## C.   RULE 5 STATEMENT

Respondent does not believe the petition is barred by
limitations or successive but does believe one or more of
petitioner's claims are unexhausted.   (Resp't Ans. at 13-14)

---

[2]To the extent petitioner attempts to raise new factual
and/or legal arguments in his reply brief, they are not
considered. *See United States v. Rodriguez*, 602 F.3d 346, 360
(5th Cir. 2010).

### D.   EXHAUSTION

Respondent asserts petitioner's third and eighth claims, in which he raises a *Batson* challenge, and seventh claim, in which he raises a sufficiency of the evidence challenge, are unexhausted and procedurally barred from the court's review. (Resp't Ans. at 17-21)

Applicants seeking habeas corpus relief under § 2254 are required to exhaust all claims in state court before requesting federal collateral relief.   28 U.S.C. § 2254(b)(1); *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999).   The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest court of the state.   *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-48 (1999); *Fisher*, 169 F.3d at 302; *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982).

In Texas, the highest state court for criminal matters is the Texas Court of Criminal Appeals.   *Richardson v. Procunier*, 762 F.2d 429, 431-32 (5th Cir. 1985).   Thus, a Texas prisoner may satisfy the exhaustion requirement by presenting both the factual and legal substance of a claim to the Texas Court of Criminal Appeals in either a petition for discretionary review or a state habeas corpus proceeding pursuant to article 11.07 of the Texas

14

Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 11.07 (West Supp. 2012); *Depuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988).

A review of the state court records reveals that petitioner's third and eighth claims were raised in his briefs on appeal but were not raised in his petitions for discretionary review. (App.'s Br. at 5-7; App.'s PDR at 3; 01SHR at 10-13; 02SHR at 10-13) And, although raised in petitioner's state habeas applications, the state habeas court, in recommending denial of habeas relief, expressly applied the state procedural rule that habeas corpus may not be used to relitigate matters addressed on direct appeal, unless certain requirements are met, which were not in petitioner's case. (01SHR at 163-64; 02SHR at 161-62) *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Thus, claims three and eight have not been considered and addressed on the merits by the Texas Court of Criminal Appeals and are unexhausted. Additionally, to the extent petitioner's claims in this federal petition exceed the scope of the claims presented in the state courts, the claims are unexhausted.

Under the Texas abuse-of-the-writ doctrine, however, petitioner cannot now return to state court for purposes of exhausting the claims. Tex. Code Crim. Proc. Ann. art. 11.07, § 4.

15

The abuse-of-the-writ doctrine represents an adequate state procedural bar to federal habeas review. *See Nobles v. Johnson,* 127 F.3d 409, 423 (5th Cir. 1997). Therefore, absent a showing of cause and prejudice or a miscarriage of justice, such showing not having been demonstrated, petitioner's third and eighth claims are procedurally barred from this court's review.

Further, a review of the state court records, reveals petitioner's seventh claim challenging the factual sufficiency of the evidence was raised in petitioner's appellate briefs and in his petitions for discretionary review, *albeit* couched in the context of whether a factual sufficiency claim remained viable under state law following the Texas Court of Criminal Appeals's decision in *Watson v. State,* 204 S.W.3d 404 (Tex. Crim. App. 2006). (01SHR at 200-02; 02SHR at 197-99; Pet'r PDR at 5-7) Liberally construed, the undersigned finds the claim was sufficiently exhausted for purposes of these findings and legal conclusions.

### E.   DISCUSSION

*Legal Standard for Granting Habeas Corpus Relief*

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was

adjudicated on the merits in state court proceedings unless he shows that the prior adjudication:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court.  28 U.S.C. § 2254(d).  A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  A state court decision will be an unreasonable application of clearly established federal law if it correctly identifies the applicable rule but applies it unreasonably to the facts of the case. *Williams*, 529 U.S. at 407-08.

The Act further requires that federal courts give great deference to a state court's factual findings.  *Hill*, 210 F.3d at 485.  Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct.  The applicant has the burden of rebutting the

17

presumption of correctness by clear and convincing evidence.   28

U.S.C. § 2254(e)(1).   Typically, when the Texas Court of Criminal

Appeals denies relief in a state habeas corpus application

without written order, it is an adjudication on the merits.

*Barrientes v. Johnson*, 221 F.3d 741, 779-80 (5th Cir. 2000); *Ex*

*parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997).

In this case, the state habeas court entered findings of

fact, and the Texas Court of Criminal Appeals adopted those

findings and denied habeas relief without written order.   (State

Habeas R., vol. 4, at 721-33)   Absent clear and convincing

evidence in rebuttal, the findings are presumed correct and

deferred to by the court in addressing petitioner's claims.

### 1.  Bond Hearing

Under his first and second grounds, petitioner claims he was

denied due process of law, equal protection under the law and a

fair trial at his bond hearing because the trial court allowed

the state prosecutor, Rainy Webb, to use her lap-top computer to

take down portions of his and his attorney's "testimony relevant

to the facts and evidence he intended to rely upon in part as his

defense while the court reporter was absent" and by not allowing

the defense to subpoena Webb as a witness.   (Pet. at 7-7C; Pet'r

Traverse at 24-26) Petitioner further claims the prosecutor

18

should have recused herself from the case after doing so because
she became a "material witness to the defense" and gained an
unfair advantage by using the information to influence the state
expert's opinion on which direction the bullet hit him, from the
front or the back. As such, he claims the prosecutor engaged in
prosecutorial misconduct and violated his rights under *Brady* by
not providing a copy of the "computer file" to him. *Brady v.
Maryland*, 373 U.S. 83 (1963).

The state habeas court entered the following relevant
findings of fact on the issue:

1. During the bond reduction hearing, the prosecutor
   (Hon. Rainey Webb) used her lap-top computer to
   take notes.

2. Ms. Webb was not called as a witness in the
   applicant's trial.

3. Ms. Webb did use her notes to refresh her memory
   because she was not called as a witness.

4. Ms. Webb was not required to turn over any notes
   she took during a bond reduction hearing.

5. The fact that Ms. Webb may have learned useful
   information during the applicant's bond reduction
   hearing does not convert Ms. Webb into a witness
   or require her to disclose her notes.

6. Ms. Webb's notes were taken during a hearing in
   open court and from evidence brought forth by the
   applicant.

7. The applicant cannot show that the substance of

Ms. Webb's notes were non-disclosed since they came from a live hearing in open court.

8.  Ms. Webb had no *Brady* obligation to turn over her notes taken during the bond reduction hearing.

9.  The applicant did not request Ms. Webb's recusal.

10. Ms. Webb had no obligation to recuse herself because she was not called as a witness in the applicant's case.

11. Ms. Webb's conduct in taking notes during the bond reduction hearing did not convert Ms. Webb into a material witness.

(01SHR at 160-61; 02SHR at 158-59)

Based on its findings, and relying solely on state law, the court entered the following legal conclusions and recommended denial of habeas relief:

1.  A criminal defendant is only entitled to notes taken by a prosecutor during a hearing if the prosecutor is called as a witness and if the prosecutor uses those notes to refresh her memory.[3]

2.  Since Ms. Webb was not called as a witness and did not use her notes to refresh her memory, the applicant was not entitled to her notes.

3.  Ms. Webb's conduct did not violate the applicant's due process and fair trial rights.

---

[3]The state court cites to *Pondexter v. State*, 942 S.W.2d 577, 582 (Tex. Crim. App. 1996), and former Rule 611 of the Texas Rules of Evidence (currently TEX. R. EVID. 612, entitled "Writing Used to Refresh Memory").

4.   Under *Brady*, a criminal defendant must show (1)
the State failed to disclose evidence, regardless
of the prosecution's good or bad faith, (2) the
withheld evidence is favorable to the defendant,
and (3) the evidence is material, i.e., there is a
reasonable probability had the evidence been
disclosed, the outcome of the trial would have
been different.

5.   The applicant has not shown a *Brady* violation
because Ms. Webb's notes concerned evidence
presented in open court and, thus, were not non-
disclosed.

6.   A defendant must request prosecutor's recusal.

7.   The applicant did not preserve any complaint
regarding Ms. Webb's non-recusal because he did
not request her recusal.

8.   M. Webb was under no obligation to recuse herself
because she was not a witness in the applicant's
trial.

(01SHR at 161-62; 02SHR at 159-60) (citations omitted)

To the extent petitioner's claims involve matters of state

evidentiary law, they do not form the basis for federal habeas

relief. *Wainwright v. Goode*, 464 U.S. 78, 83-84 (1983). Nor has

petitioner demonstrated that the state court acted unreasonably

or contrary to the Supreme Court's decision in *Brady*, and its

progeny, so as to warrant federal habeas relief. There was no

concealment at all of material favorable to petitioner.

## 2.   *Ineffective Assistance of Counsel*

Under his fourth and fifth grounds, petitioner claims he

received ineffective assistance of trial and appellate counsel.
(Pet. at 8-8F)  A criminal defendant has a constitutional right
to the effective assistance of counsel at trial and on a first
appeal as of right.  U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*,
469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S.
668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967).
An ineffective assistance claim is governed by the familiar
standard set forth in *Strickland v. Washington*.  466 U.S. at 668.
*See also Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001)
(applying the *Strickland* standard to ineffective assistance
claims against appellate counsel).  To establish ineffective
assistance of counsel a petitioner must show (1) that counsel's
performance fell below an objective standard of reasonableness,
and (2) that but for counsel's deficient performance the result
of the proceeding would have been different.  *Strickland*, 466
U.S. at 688.  A court must indulge a strong presumption that
counsel's conduct fell within the wide range of reasonable
professional assistance or sound trial strategy.  *Id*. at 668,
688-89.  Judicial scrutiny of counsel's performance must be
highly deferential and every effort must be made to eliminate the
distorting effects of hindsight.  *Id*. at 689.

Petitioner was represented at trial by Gwinda Burns and on

appeal by Ronald G. Couch.   The state habeas judge conducted a hearing by affidavit.

### Trial Counsel

Petitioner claims trial counsel was ineffective by-

(A) failing to conduct a proper pretrial investigation by hiring a private investigator, requesting funds to hire forensic and medical defense experts, subpoenaing Rainy Webb, Isidro Salazar and his surgeon to testify, and investigating whether there had been an internal affairs investigation by the police regarding the shooting;

(B) calling only two witnesses, neither of which were at the store when the incident occurred;

(C) failing to properly articulate her request for a jury instruction of self-defense against multiple assailants;

(D) failing to impeach Officer Hull on cross-examination that no internal affairs file existed;

(E) failing to object "to the State using a lap-top to allow State's witness, Charles Hollie[,] to view with her while she coached him through his testimony;

(F) failing to subpoena Toledo's and Mill's medical records to demonstrate how minor their injuries were;

(G) failing to call character witnesses on his behalf at the punishment phase of trial; and

(H) failing to "present" and obtain a hearing on his motion for new trial.

(Pet. at 8-8E)

Supported by documentary evidence, counsel Burns responded

to these allegations in her affidavit as follows:

On July 5, 2006 I was retained by Applicant's
mother to represent DANA A. MCCRAY in cause numbers
1026171D and 1026153D.  As a part of my duties as his
counsel I ensured that Applicant received effective
assistance of counsel as guaranteed by the Sixth
Amendment.  My performance during said representation
was not deficient.  There exist[s] no reasonable
probability that my actions undermined confidence in
the outcome of Applicant's conviction.

"Applicant's 1st contention is that I was
deficient in:  1) failing to conduct a proper pretrial
investigation by hiring a private investigator to
investigate the crime scene, interview witnesses and
assist in evaluating the physical evidence.  First, it
is important to note that my prior training as an
assistant district attorney provided me with the
expertise and knowledge needed to investigate this
case.  Moreover, my twenty plus years [as a] criminal
. . . trial litigator also enhanced my experience in
this area.  However, it is important to note that I did
speak with Applicant about hiring an investigator in
this case, however, the Applicant insisted on saving
money in this area by offering family members to assist
me with the investigation.  Access to funds for an
investigator was not an issue, the Applicant chose not
to utilize funds for an investigator.  I personally
spent numerous hours investigating this case,
interviewing witnesses, visiting the crime scene and
reviewing the evidence.  Moreover, my paralegal at the
time had a law enforcement background in that she had
served in the United States Army and her MOS was
military police.  I personally interviewed C.J. [the
manager of 7-11 at the time in question]; Scott Lins
[loss prevention for 7-11]; Patrick Devine [division
manager loss prevention of 7-11]; Lisa Lyon [assistant
to market manager for 7-11]; Devon Thomas [filed
consultant for 7-11]; Harold McDaniel [on duty at 7-11
at time of incident]; Caron Cross [on duty at 7-11 at
time of incident]; Marlina Anderson [on duty at 7-11 at
time of incident]; Ella Lacy [on duty at 7-11 at time

24

of incident]; Shawn Harris and Delores Harris; Carlos Toledo; Joshua Magie; John Salazar; Debra Decker and Charles Hollie.  I personally visited the crime scene on several occasions and took photos of the inside of the 7-11; the back room where the surveillance equipment is located and outside of the 7-11.  I conducted extensive questioning of the employees of 7-11 about surveillance cameras and tapes.  I drafted and filed subpoenas and served the subpoenas.  IT WAS APPLICANT WHO CHOSE NOT TO HIRE AN INVESTIGATOR OVER MY ADVICE TO HIM.  However, I did not let that stand in the way of me investigating his case.  The initial offer by the State was 25 years TDC.  However, after my investigation and numerous conferences with the Tarrant County District Attorney's Office, I was able to get an offer of 5 years TDC.  All offers were rejected by the Applicant.

**"Applicant's 2nd contention** is that I was deficient in failing to request funds from the court to hire an independent forensic and medical expert[] to assist the defense.  THERE WAS NEVER A DOUBT AS TO THE FUNDS BEING ABLE TO BE PAID BY APPLICANT, IT WAS HE THAT INSISTED THAT I NOT HIRE THEM.  I had already arranged and made contact with both an independent forensic expert and a medical expert.  Specifically, I contacted David B. McReynolds, MD [Applicant's treating physician]; Aliece Watts M.S. [consulting Forensic Scientist]; Edward E. Hueske [consulting Forensic Scientist] and Ron Fazio [certified in Forensic the Texas Court of Criminal Appeals Firearms Evidence Examination and Identification].  THERE WERE NO EXPERTS BECAUSE OF APPLICANT'S OWN DECISION NOT MINE.  HE WAS FINANCIALLY ABLE TO HIRE AN EXPERT, BUT DECIDED NOT TOO [sic].  APPLICANT DID NOT WANT ANY ASSISTANCE FROM THE COURT FOR APPOINTMENTS.  HE DID NOT WANT A COURT APPOINTED ATTORNEY NOR A COURT APPOINTED INVESTIGATOR OR EXPERTS. I had received a down payment of $500.00 from Applicant's family for the expert.  However, Applicant informed his family that he did not want an expert and told them not to remit the remainder of the fees for the expert.  I returned the $500.00 to the family.

"Applicant's 3rd contention is that I was
deficient in failing to request a subpoena for the
ADA's personal computer notes she took during the bond
reduction hearing.  This contention is untrue.  I did
secure a subpoena for Rainey Webb's personal computer
notes.

"Applicant's 4th contention is that I was
deficient for failing to call Isidro Salazar as a
hostile witness for the defense.  This option was
discussed with Applicant and it was decided as trial
strategy not to call him.  Salazar was a fried of
Carlos Toledo who waited in the truck while Carlos went
inside 7-11 to cash his check.  He said that Applicant
followed Carlos out of the store.  After visiting with
the witnesses, it was clear that Salazar was not a
defense witness.

"Applicant's 5th contention is that I was
deficient for failing to subpoena the treating surgeon
who operated on him.  This contention is also untrue.
Moreover, Applicant is aware that I had spoken with Dr.
McReynolds on several occasions and kept him informed
about trial dates and his availability.  Prior to trial
I had filed Applicant's MedStar records and medical
records as business records.  I had kept in constant
contact with Dr. McReynolds.  It should also be noted
that I proved through Victoria Van Fleet, a firearms
examiner for the Fort Worth Police Department[,] and
through the Applicant's medical records the notations
of Dr. McReynolds reflected one of the gunshot wounds
was to the back.  Dr. McReynolds was on call to
testify, however, it was Applicant who requested that I
rest the defense without calling Dr. McReynolds to
testify.

"Applicant's 6th contention is that I was
deficient in that I failed to investigate whether or
not the police had completed an investigation on an
officer-involved shooting.  To the contrary, I
contacted the FWPD about this issue.

"Applicant's 7th contention is that I was

deficient in that I only called two witnesses on his behalf. These were the names of witnesses given to me that had seen Applicant immediately prior to the shooting. They could testify that he was not intoxicated and was not looking for trouble and that he was only running to 7-11 for a drink. That was relevant to Applicant's state of mind at the time, the fact that he was not under the influence of any alcoholic beverage or drugs. The witnesses called also were familiar with his demeanor and propensity to be kind. Three witnesses were called by the defense: Marsha Adams, Delores Harris and Shawn Harris. I had subpoenaed other witnesses who were not present at the time, but was [sic] on call. However, the Applicant wanted me to rest. Therefore, no other witnesses were called.

"Applicant's 8th contention is that I was deficient in failing to properly articulate a request for self-defense instruction on an attack by multiple assailants charge to the jury. The record speaks for itself. The request for self-defense instruction was not deficient.

"Applicant's 9th contention is that I was deficient in failing to object to the State using a lap-top to allow State's witness Charles Hollie to view. I am not sure what is the basis for this contention, however, no lap-top was used to assist any witness while they were testifying in this case. THIS CONTENTION IS UNTRUE.

"Applicant's 10th contention is that I was ineffective for failing to subpoena Toledo and Mill's medical records to demonstrate to the jury how minor the injuries they suffered were. To the contrary, I did subpoena these records.

"Applicant's 11th contention is that I was ineffective and deficient for failing to call any character witnesses during the punishment phase of the trial. To the contrary, Mrs. McCray [Applicant's mother], Erica Glott [Applicant's sister] and Jerry

White [Applicant's cousin] were called as character witnesses.

**Applicant's 12th contention** is that I was deficient for failing to "present" applicant's motion for new trial. Applicant was sentenced on October 12, 2007. I gave notice of appeal immediately. The trial court appointed Attorney Ronald Couch as Applicant's appellate counsel on October 12, [2]007. I drafted and filed a Motion for New Trial as a courtesy on October 17, 2007.

(01SHR at 58-153; 02SHR at 56-151) (citations and attachments omitted) (emphasis in the original)

The state habeas court entered findings of fact consistent with counsel's affidavit and the state court records and, applying the *Strickland* standard, concluded that trial counsel adequately and independently investigated petitioner's case, fully and adequately prepared for petitioner's trial, made reasonable decisions regarding the calling of witnesses, did not hire an investigator due to petitioner's decision not to have these services or to pay for them, and functioned as counsel guaranteed by the Sixth Amendment. Additionally, the court concluded petitioner had failed to establish the probability of a different result, absent the alleged deficient conduct, sufficient to undermine confidence in the outcome of his trial. (01SHR at 165-70; 02SHR at 163-69)

Petitioner has presented no argument or evidence in this

28

federal habeas action that could lead the court to conclude that
the state courts unreasonably applied the standards set forth in
*Strickland* based on the evidence presented in state court.   28
U.S.C. § 2254(d).   Applicant's claims are largely conclusory or
speculative with no legal or evidentiary basis, contradicted by
the record, involve strategic decisions by counsel, or would have
required counsel to make frivolous objections, which are either
insufficient to raise a constitutional issue and/or outside this
court's preview on federal habeas review.   *See Strickland*, 460
U.S. at 689 (holding strategic decisions by counsel are virtually
unchallengeable and generally do not provide a basis for post-
conviction relief on the grounds of ineffective assistance of
counsel); *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010)
(providing "[c]laims of uncalled witnesses are not favored on
federal habeas review because the presentation of witnesses is
generally a matter of trial strategy and speculation about what
witnesses would have said on the stand is too uncertain"); *Green
v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) (holding
conclusory arguments are insufficient to support claim of
ineffective assistance); *Koch v. Puckett*, 907 F.2d 524, 530 (5th
Cir. 1990) (concluding that "counsel is not required to make

29

futile motions or objections").

Overall, trial counsel devised a viable defense, filed pretrial motions, conducted voir dire, made meritorious objections and motions during trial, cross-examined state witnesses, called witnesses on petitioner's behalf, and gave opening and closing arguments.  Even if petitioner could demonstrate deficient performance, the right to counsel does not require errorless counsel.  *Johnson v. Estelle*, 704 F.2d 232, 239 (5th Cir. 1983).  A petitioner is required to demonstrate that counsel's performance, in light of the entire proceeding, was so inadequate as to render his trial unfair.  *Washington v. Watkins*, 655 F.2d 1346, 1355 (5th Cir. 1981).  Having reviewed the entirety of the record, counsel's performance was not outside the wide range of professionally competent assistance, and petitioner has failed to show that, but for counsel's acts or omissions, he would have been acquitted of the charges or that his sentences would have been significantly less harsh.  *United States v. Stewart*, 207 F.3d 750, 751 (5th Cir. 2000).

### *Appellate Counsel*

Petitioner claims appellate counsel was ineffective by failing to raise a legal sufficiency-of-the-evidence claim in

conjunction with his factual sufficiency-of-the-evidence claim in his brief on appeal, in light of the Texas Court of Criminal Appeals's decision in *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). (Pet. at 8F) Counsel Couch responded to petitioner's allegation in his affidavit as follows:

> 4. After reviewing the record, I determined that there were three issues to present to the Court of Appeals which I presented to the Court in my brief. I note that the Court of Appeals took thirty-nine pages in its opinion to dispose of the issues which, in my opinion is unusually lengthy.

> 5. In respect to the issue complained of by Mr. McCray, it was my opinion that urging factual insufficiency was appropriate since whether McCray was shot from the front or from behind was purely a fact issue, along with other contested fact issues, and were not legal sufficiency issues. The Court of Appeals, in disposing of this issue, examined the testimony of all relevant witnesses and concluded that the evidence was factually sufficient to support the conviction. I am of the opinion that arguing legal insufficiency would not have changed the outcome of the Court's decision.

> 6. In response to Mr. McCray's complaint that by [sic] oral argument was fact based, as opposed to legal sufficiency based, I recall having to respond to questions from Justice McCoy who asked me to explain the apparent conflict in his interpretation of certain facts versus the defense interpretation. I believe the Court's conclusion was that our position was untenable. Thus, much of the oral argument was spent defending our fact interpretation.

> 7. In preparing this response, I note that the case pointed out by Mr. McCray, Watson v. State, . . ., has been overruled by the case of Brook v. State, 323 S.W.3d 893 (Tex. Crim. App 2010) . . . . In this case,

the Court of Criminal Appeals held that the *Jackson v. Virginia* legal sufficiency standard was indistinguishable from the *Clewis* factual-sufficiency standard and therefore, the *Jackson v. Virginia* standard was the only standard that a reviewing court should apply in determining whether the evidence was sufficient. In the *Brook* case, the Court of Criminal Appeals held ". . . there was no meaningful distinction between the sufficiency standards, the court of appeals necessarily found that the evidence was legally insufficient to support the conviction."

The standard has been changing from year to year in this area of review. The Court of Appeals in Mr. McCray's case would have found legal sufficiency when it found factual sufficiency if it had applied the current *Brook* standard. Therefore, in the undersigned's opinion, arguing legally insufficiency in conjunction with factually insufficiency would not [have] resulted in a different conclusion by the Court of Appeals in this case.

(01SHR at 156-57; 02SHR at 154-55)

The state habeas court entered findings of fact consistent

with counsel's affidavit and the state court records, and

concluded that by rejecting petitioner's factual sufficiency

claim, the Court of Appeals found that the evidence was legally

sufficient to support petitioner's convictions and that counsel

exercised reasonable professional judgment in determining which

issues to raise in the applicant's direct appeal and which issues

to reject for that appeal. Additionally, on that basis, the

court concluded there was no reasonable probability that the

outcome of petitioner's appeal would have been different had

Couch or another counsel raised a legal sufficiency challenge. (01SHR at 172-74; 02SHR at 170-72)

Petitioner has presented no argument or evidence in this federal habeas action that could lead the court to conclude that the state courts unreasonably applied the standards set forth in *Strickland* based on the evidence presented in state court. 28 U.S.C. § 2254(d). As noted by the habeas court, appellate counsel is not required to raise every conceivable argument urged by his client on appeal, regardless of merit. *Smith v. Robbins*, 528 U.S. 259, 287-88 (2000). It is counsel's duty to choose among potential issues, according to his or her judgment as to their merits and the tactical approach taken. *Jones v. Barnes*, 463 U.S. 745, 749 (1983). Further, state law demonstrates that had counsel raised the issue on direct appeal, the result of his appeal would not have been different.

### 3.  *Right to a Public Trial*

Under his sixth ground, petitioner claims his constitutional rights were abridged by the trial court's closing of the voir dire proceedings to his sisters and to the public in general. (Pet. at 8G) The state habeas court entered the following findings of fact regarding the issue:

1.   The applicant's sisters each state that a court bailiff

33

told them they could not be in the courtroom during the
voir dire proceedings because it was too crowded and
because admission was restricted to the defendant, the
attorneys and the prospective jurors.

2.   The applicant made no formal objection to the alleged
     closing of the courtroom.

3.   There is no evidence that the trial judge officially
     closed the court proceedings or he was even aware that
     members of the defendant's family had been excluded
     from the courtroom.

4.   The trial court had no opportunity to consider
     reasonable accommodation measures.

5.   The trial court did not deny the applicant his public
     trial rights.

(01SHR at 175; 02SHR at 173)

Based on its findings, and citing to *Presley v. Georgia*, 558

U.S. 209 (2010) (holding right to public trial extends to voir

dire proceedings and defendant's right to a public trial was

violated when trial court excluded the public from voir dire

proceeding without considering all reasonable alternatives to

closure), the state habeas court entered the following legal

conclusions in recommending denial of the claim:

1.   A criminal defendant's Sixth Amendment right to a
     public trial extends to the voir dire of
     prospective jurors.

2.   Trial courts are obligated to take every
     reasonable measure to accommodate public
     attendance at criminal trials.

34

3.    A defendant's failure to object to the closing of a courtroom waives his right to a public trial.

4.    The applicant waived his right to a public trial because he did not object to this alleged closing of his courtroom.

5.    Since there is no evidence that the trial judge officially closed the court proceedings or he was even aware that members of the defendant's family had been excluded from the courtroom, the applicant has not shown that he was denied his right to a public trial.

(01SHR at 175-76; 02SHR at 173-74)

The state courts' adjudication of the claim comports with Supreme Court precedent. *Levine v. United States*, 362 U.S. 610, 619 (1960); *United States v. Cockerham*, 397 Fed. Appx. 944, 945, 2010 WL 4116898, at *1 (5th Cir. Oct. 19, 2010), *cert. denied*, 131 S. Ct. 3078 (2011).

### 4.  *Sufficiency of the Evidence*

Under his seventh ground, petitioner claims there was insufficient evidence to support his convictions.  (Pet. at 8I) On appeal, petitioner challenged only the factual sufficiency of the evidence, however such a claim is not cognizable on federal habeas review.  (01SHR at 185; 02SHR at 182) The power of state appellate courts to review the factual sufficiency of the evidence was derived from state law.  *Id.* at 129-30.  There is no corresponding right of review under the United States

35

Constitution.  *West v. Johnson* 92 F.3d 1385, 1394 (5th Cir. 1996).

### 5.  *Jury Instruction*

Under his ninth ground, petitioner claims the trial court erred by denying his request for a jury instruction on "multiple attackers" as a defense raised by the evidence, in violation of due process.  (Pet. at 8K)  In overruling this issue on appeal, the state appellate court, applying state law, provided:

**Applicable Law**

> A defendant is entitled to an instruction on every defensive issue raised by the evidence "whether that evidence is weak or strong, unimpeached or uncontradicted, and regardless of what the trial court may or may not think about the credibility of the defense."  A self-defense against multiple attackers charge is warranted if "there is evidence, viewed from the accused's standpoint, that he was in danger of an unlawful attack or a threatened attack at the hands of more than one assailant."  Thus, the issue is whether there is evidence that, viewed from appellant's standpoint, he was in danger of an unlawful attack or threatened attack from Toledo, Mills, and Officer Hull.

**Analysis**

> Appellant's requested instruction read as follows: "This right of self-defense also applies when the defendant reasonable [sic] believes that he is under attack by more than one person.  In such circumstances, the defendant has a right to defend himself against any one or more of the persons or against all of them."  Appellant points to the evidence that the entire incident happened quickly in "a matter of seconds."  He contends that the short time frame raises the issue of

whether he perceived himself under attack from all three persons; in other words, while he was arguing with Toledo, Mills and Officer Hull came upon him so fast that he perceived he was the victim of a concerted group attack.  He also points to the evidence that John Salazar, the man pumping gas at the time, saw Toledo and appellant shouting at and shoving each other and the testimony that Mills pushed appellant first after getting in between appellant and Toledo.

Viewing the evidence in the light most favorable to appellant, we conclude that he has not shown he was entitled to such an instruction, if one is even available.

> The theory behind the multiple assailants charge is that, when it is clear that an attack is being conducted by multiple people as a group, a defendant is justified in using force against any member of the group, even if the recipient of that force is not engaging in conduct that would, by itself, justify the use of force (or deadly force as the case may be).

Here, the evidence shows that appellant stabbed Toledo before Mills got to the two men.  Toledo and Mills, the two closest to appellant at the time, both testified that Mills was identifying himself as an officer while approaching.  Officer Hull did not see appellant stab Toledo, and he testified that he did not draw his weapon until *after* appellant stabbed Mills. He was behind Mills and not involved in the physical confrontation; in fact, there is no evidence that appellant even saw Officer Hull.

John Salazar's version of events does not contradict the other witnesses' versions of the events in these respects; he simply could not confirm what was or was not said because he was standing too far away. He testified that Mills was already wrestling with appellant before Officer Hull came out of the store. He also heard someone say that appellant had a knife

before he heard shots.

Appellant's requested defense appears to rely on the absence of evidence rather than on "weak or strong, unimpeached or uncontradicted" evidence that was actually admitted. Accordingly, we conclude and hold that, regardless of the availability of the requested instruction at law, the defensive issue was not raised by the evidence and, therefore, the trial court did not err by refusing to include it in the charge.

(01SHR at 200-03; 02SHR at 203-06) (citations omitted)

Instructional errors of state law generally may not form the basis for federal habeas relief. *Gilmore v. Taylor,* 508 U.S. 333, 343 (1993); *Estelle v. McGuire,* 502 U.S. 62, 71-72 (1991). To prove constitutional error cognizable under § 2254, a petitioner must demonstrate that the instruction rendered his trial fundamentally unfair in violation of the due process clause. *Henderson v. Kibbe,* 431 U.S. 145, 153 (1977). An omission to give an instruction is less likely to be prejudicial than a misstatement of the law. *Id.* at 155. The inquiry required of this court is only whether any error in failing to give the requested instruction, by itself, so infected the entire trial that the resulting conviction(s) violate due process. *Galvan v. Cockrell,* 293 F.3d 760, 764-65 (5th Cir.2002).

In this case, the jury instructions included a self-defense instruction, and the state courts have determined the evidence at

trial did not warrant an additional instruction on "multiple attackers." "[W]e do not sit to review that state's interpretation of its own law." *Jackson v. Anderson*, 112 F .3d 823, 825 (5th Cir. 1997) (quoting *Seaton v. Procunier,* 750 F.2d 366, 368 (5th Cir. 1985) ("We will take the word of the highest court on criminal matters of [Mississippi] as to the interpretation of its law, and we do not sit to review that state's interpretation of its own law.")). Further, denial of petitioner's requested instruction, if unfair at all, was not so unfair as to rise to the level of a violation of his due process rights.

For the reasons discussed herein,

The court ORDERS the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied.

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court, and 28 U.S.C. § 2253(c), for the reasons discussed herein, the court further ORDERS that a certificate of appealability be, and is hereby, denied, as

petitioner has not made a substantial showing of the denial of a constitutional right.

SIGNED April ___23___, 2013.

_____
JOHN McBRYDE
UNITED STATES DISTRICT JUDGE